# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

CHARLES E. WATKINS,              )
                                 )
      Plaintiff,              )
                                 )
      v.                      )     CAUSE NO.: 3:05-CV-28-TS
                                 )
BARBARA KASPER,                  )
                                 )
      Defendant.              )

## OPINION AND ORDER

The Plaintiff, a prison law clerk trying his case *pro se*, sued the Defendant for retaliating against his exercise of the First Amendment right to complain about the Defendant's handling of his personal property and her implementation of various library policies that restricted the prison law clerks' ability to assist other inmates with their legal matters. The case was tried to a jury over three days. The jury returned a verdict for the Plaintiff and awarded him $150 in compensatory damages and $1000 in punitive damages.

The matter is now before the Court on the Defendant's motion for judgment as a matter of law. The motion was made orally at trial at the close of the Plaintiff's case and at the close of all the evidence, and it was renewed after the jury returned its verdict, as required by Rule 50 of the Federal Rules of Civil Procedure. The motion was directed at four issues: (1) whether the Plaintiff could recover damages for mental or emotional injuries; (2) whether the Plaintiff presented sufficient evidence that Defendant Sally Stevenson was aware that he had engaged in any constitutionally protected activity; (3) whether the Plaintiff's speech was constitutionally protected; and (4) whether the second conduct report filed against the Plaintiff can be deemed a retaliatory act. The Plaintiff did not object to the motion as it related to the first two issues. The Court granted the motion as to those issues, dismissed Sally Stevenson from the case, and took

the motion under advisement as to the remaining issues. For the reasons explained in this

opinion, the Defendant's renewed motion is denied.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 50 allows a court to enter judgment as a matter of law

when the motion is first offered or to reserve judgment on the motion until after a jury has

returned its verdict. Fed. R. Civ. P. 50(b). In this case, the Court reserved judgment on the

Defendant's motion in part and submitted the case to the jury. A judgment as a matter of law is

granted when "a party has been fully heard on an issue during a jury trial and the court finds that

a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on

that issue." Fed. R. Civ. P. 50(a). "[T]he standard for granting summary judgment 'mirrors' the

standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves*

*v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

In viewing the facts presented on a motion for judgment as a matter of law, a court "must

view the evidence in the light most favorable to the non-moving party and must draw all

reasonable inference in that party's favor." *Lasley v. Moss*, 500 F.3d 586, 590 (7th Cir. 2007). A

court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or

to determine the truth of the matter, but instead to determine whether there is a genuine issue of

triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443. "Since judgment as a matter of

law deprives the party opposing the motion of a determination of the facts by a jury, it should be

granted cautiously and sparingly." 9A Charles Alan Wright & Arthur Miller, Federal Practice

and Procedure § 2524 (2d ed. 1995); *see also Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir.

2004) (a jury verdict "cannot be lightly set aside").


## ANALYSIS

The Defendant's first remaining argument is that the Plaintiff failed to demonstrate that

he engaged in any constitutionally protected activity. In order to prevail on a First Amendment

retaliation claim, "a prisoner must demonstrate the following: (1) that the speech or conduct at

issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that

there was a causal connection between the protected speech and the adverse action." *Gill v.*

*Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

> An action taken in retaliation for the exercise of a constitutionally protected right
> is actionable under § 1983 even if the act, when taken for a different reason,
> would have been proper. This includes retaliation against an inmate for exercising
> his constitutional right to access the courts or to use the prison grievance process.
> Indeed, a prisoner can sufficiently state a claim for relief when he alleges that
> prison officials issued baseless disciplinary tickets against him in retaliation for
> pursuit of administrative grievances.

*Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (internal citations and quotation marks

omitted). Oral grievances are protected the same as written grievances. *See Pearson v. Welborn*,

471 F.3d 732, 741 (7th Cir. 2006) ("We are also unconvinced that the form of expression—i.e,

written or oral—dictates whether constitutional protection attaches."). The Defendant believes

she is entitled to judgment as a matter of law because the Plaintiff's speech at the February 13,

2004, meeting was not related to a matter of public concern, and because the Plaintiff failed to

introduce any evidence of grievances or the content of those grievances.

Participating in the February 13 meeting were the Plaintiff, the Defendant, and a few

other law clerks and prison administrators. The Plaintiff elicited testimony from several witnesses that he and the Defendant held contrasting views with regard to the manner in which library resources and inmate law clerks should be utilized in assisting other inmates with their various legal matters. Essentially, the Defendant believed that the access to the library and its resources that had been provided to inmates in the past exceeded what they were entitled to. She also believed the law clerks' only function was to retrieve books and forms that inmates requested rather than to assist the inmates with completing the forms and filing legal papers. The Plaintiff, on the other hand, believed that the law clerks should be able to provide as much assistance as possible (short of what he understood to be giving legal advice) in preparing legal documents and navigating through the judicial system.

Consistent with her views, the Defendant began instituting policies to restrict the law clerks' privileges and duties, such as prohibiting the law clerks from storing any personal property (including some legal materials) in the library and assisting other inmates beyond retrieving requested books and forms. The Plaintiff thought these changes were, at least in part, an effort to reduce the number of tort claims that inmates were filing. The Plaintiff expressed his disagreement with the new policies at the February 13 meeting.

It is true, as the Defendant points out, that the Plaintiff testified that at the February 13 meeting he complained that the new policies violated *his* constitutional rights and that they interfered with *his* ability to do his job. However, a fair evaluation of all the testimony in the Plaintiff's case-in-chief indicates that the Plaintiff was not just complaining about the alleged violation of his own constitutional rights, but also about what he believed was the violation of all the inmates' constitutional rights. He believed the inmates had a constitutional right to more

substantial assistance than the Defendant would allow.

As for the evidence of other grievances, the Plaintiff points to his testimony that on February 26, 2004, he orally complained to the Defendant that she left his books and personal materials out in the open such that other prisoners could disturb or steal them. In fact, that is the complaint that he believes led to the Defendant filing a conduct report against him charging him with intimidation. He also claims that at the February 13 meeting he was both expressing his general opinion about the constitutionality of the new library policies and orally grieving the impact those policies had on him personally.

## A.       February 13 Meeting

The Defendant argues that to state a retaliation claim with respect to the speech during the February 13 meeting, the Plaintiff must establish that he was addressing a matter of public concern. It is not entirely clear that the First Amendment demands such a showing. However, some Seventh Circuit cases have adopted this requirement for prisoner First Amendment retaliation claims, so the Court must apply it here. The Court finds that the February 13 speech did relate to a matter of public concern. Reaching this conclusion first requires an understanding of the evolution of the public concern requirement.

## 1.       *Permissible Limitations on Speech in Various Contexts*

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This amendment is made applicable to the states through the Fourteenth Amendment. *See Schneider*

*v. State*, 308 U.S. 147, 160 (1939). Notwithstanding the strong language of the First Amendment, speech may be abridged in certain contexts subject to various balancing tests. The factors to be balanced vary based on the competing interests that exist in different contexts.

      (a)    *Limitations on Speech in the Public Employee Context*

The requirement that a prisoner-plaintiff establish that his speech was directed at a matter of public concern to state a retaliation claim is borrowed from the branch of First Amendment jurisprudence addressing retaliation claims in the public employee context. In *Pickering v. Board of Education*, 391 U.S. 563, 564 (1968), a school board fired a teacher for criticizing the board and the superintendent in a letter to the local newspaper addressing the way they handled past revenue-raising proposals. Even though some of the letter's statements were factually incorrect, the Supreme Court held that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 575.

The Court reaffirmed its statement from *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06 (1967), that "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Pickering*, 391 U.S. at 568. However, the Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon *matters of public concern* and the interest of the State, as an employer, in

6

promoting the efficiency of the public services it performs through its employees." *Id.* (emphasis added).

In beginning the balancing analysis, the Court first noted that because Pickering's criticisms were not directed at persons with whom he would be in regular day-to-day contact, there was no issue of "maintaining either discipline by immediate superiors or harmony among coworkers," and his relationships with the board and the superintendent were "not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Id.* at 569–70. Given the nature of these relationships, the Court explained:

> On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Id.* at 571–72. The Court remarked, as it often does in First Amendment cases, that any inaccuracy in Pickering's speech could be remedied with opposing speech. *Id.* at 572. *Cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting *Whitney v. California*, 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring)) ("the fitting remedy for evil counsels is good ones"). Based on this analysis, the Court concluded "that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 573.

The Supreme Court further fleshed out the contours of this First Amendment balancing in subsequent cases exploring speech in the public employee context. In *Perry v. Sinderman*, 408 U.S. 593, 598 (1972), the Court recognized that a non-tenured teacher's allegations that his

7

"nonretention was based on his testimony before legislative committees and his other public statements critical of the Regents' policies . . . present a bona fide constitutional claim." After *Perry*, the Supreme Court made it more difficult for public employee plaintiffs to prevail on First Amendment retaliation claims.

*Mount Healthy City School District Board of Education v. Doyle* imposed a burden-shifting analysis on these claims. 429 U.S. 274, 287 (1977). The initial burden is on the plaintiff to demonstrate that "his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor'" in the adverse decision. *Id.* If that burden is carried, then it shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Id.*

*Connick v. Myers*, 461 U.S. 138 (1983), homed in on the test for determining whether speech is related to a matter of public concern. In *Connick*, Sheila Myers was an Assistant District Attorney in New Orleans who "served at the pleasure of petitioner Harry Connick, the District Attorney for Orleans Parish." *Id.* at 141. It was undisputed that her primary responsibility was trying criminal cases and that she performed her duties competently for five and a half years.

When Myers was notified that she was being transferred to a different section of the criminal court, she objected and voiced her concerns regarding several office matters. *Id.* at 140–41. When one of her superiors, Dennis Waldron, suggested that her concerns were not shared by her colleagues, she distributed to fifteen assistant district attorneys a "questionnaire soliciting [their] views . . . concerning office transfer policy, office morale, the need for a

grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. When Waldron learned about the questionnaires, he phoned Connick and informed him that Myers was creating a "mini-insurrection." *Id.* at 141. Connick terminated Myers employment, claiming that the termination was based on her refusal to accept the transfer and because the questionnaire distribution was an act of insubordination. *Id.* Connick specifically thought Myers had been insubordinate because the questionnaire inquired of employees whether they "had confidence in and would rely on the word" of various superiors in the office and whether they were pressured to work on political campaigns, which would be damaging if the press learned about the implicit allegation. *Id.*

The Court began by deciding that while Myers' communication was not "wholly without First Amendment protection[,] . . . *Pickering*, its antecedents and progeny, lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge." *Id.* at 146. The Court then reiterated that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id*. The Court emphasized that it "in no sense suggest[ed] that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction." *Id.* at 147.

In order to determine whether the speech at issue addressed a matter of public concern, the Court evaluated the "content, form, and context of [the] given statement, as revealed by the

whole record, " *id.* at 147–48, as well ast the "manner, time, and place in which the questionnaire was distributed, " *id.* at 152. Looking at Myers' questionnaire, the Court concluded that the questions about confidence in supervisors, office morale, and the need for a grievance committee were "mere extensions of Myers' dispute over her transfer." *Id.* at 148. Because the questionnaire was prepared, distributed, and completed at the office, the Court recognized that this interfered with official work, and the function of the office was endangered. *Id.* at 153.

The case would have been different if Myers was seeking to address a failure to investigate and prosecute criminal cases or bring to light wrongdoing or a breach of the public trust. *Id.* The case was further distinguishable from *Pickering* because of the close working relationship between Myers and the superiors she was questioning, and "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id.* at 151–52. However, a stronger showing would be required on the employer's part if the speech more substantially involved matters of public concern. *Id.*

(b)      *Limitations on Speech on the Prison Context*

The Supreme Court has also permitted the curtailment of prisoners' First Amendment speech rights subject to a balancing test, but the interests subject to balancing are typically not the same as those in the public employee context. In *Procunier v. Martinez*, 416 U.S. 396, 406 (1974), *overruled on other grounds by Thornburgh v. Abbot*, 490 U.S. 401, 413–14 (1989), the Supreme Court described "the tension between the traditional policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights."

10

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Id.* at 404–05 (footnote omitted).

Nonetheless, the Court insisted that "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Id.* at 405–06. Whereas the government's interest in the public employee context is "promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568, in the prison context the "identifiable governmental interests at stake . . . are the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Martinez*, 416 U.S. at 412. To strike the appropriate balance, the Court held that the censorship of prisoner mail is permissible if the regulation or practice furthers "an important or substantial governmental interest unrelated to the suppression of expression," "the limitation of First Amendment freedoms . . . [is not] greater than is necessary or essential to the protection of the particular

11

governmental interest involved," *id.* at 414, and the censorship is "accompanied by minimum procedural safeguards," *id.* at 418. Applying this standard to the case at hand, the *Martinez* Court held that regulations that authorized the censorship of statements that "unduly complain," "magnify grievances," express "inflammatory political, racial, religious or other views," or are "defamatory" or "otherwise inappropriate" were unconstitutional. *Id.* at 415.

In *Pell v. Procunier*, 417 U.S. 817, 819 (1974), the Court upheld a regulation that "press and other media interviews with specific individual inmates will not be permitted." The Court began with the premise that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system." *Id.* at 822. It then concluded that institutional considerations, such as security and related administrative problems, justify the restriction on face-to-face communication between inmates and the press so long as reasonable and effective means of communication remain open and restrictions on communications are content neutral. *Id.* at 826.

*Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977), reiterated the interests to be balanced in adjudicating prisoner First Amendment claims. The Court held that the North Carolina Department of Correction's efforts to prohibit inmates from soliciting other inmates to join a prison labor union by barring all union meetings and refusing to deliver union publications that were mailed in bulk to several inmates for redistribution among other prisoners were constitutional. *Id.* at 121. The Court recognized that "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Id.* In light of this reality, the Court determined that the prison's conclusion that "the concept of a prisoner's labor

12

union was itself fraught with potential dangers, whether or not such a union intended, illegally, to press for collective-bargaining recognition" made the restrictions on union promoting and organizing activities reasonable. *Id.* at 127, 130.

In *Turner v. Safely*, 482 U.S. 78 (1987), the Court established the precise standard of review to be applied to prisoner First Amendment speech claims. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard affords more latitude to prison officials than *Martinez*'s heightened scrutiny standard. There are at least four considerations in determining the reasonableness of a regulation.

First, "there must be a valid, rational, connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quotation marks omitted). The logical connection between the regulation and the asserted goal cannot be arbitrary or irrational, and "the governmental objective must be a legitimate and neutral one." *Id.* at 89–90. Second, "[w]here other avenues remain available for the exercise of the asserted right courts should be particularly conscious of the measure of judicial deference owed to corrections officials." *Id.* at 90 (internal citations and quotation marks omitted). Third, a court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. . . . [T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable . . . ." *Id.*

*Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989), explicitly overruled *Martinez* and reaffirmed that the *Turner* standard governs prisoner First Amendment speech claims. The Court

again spoke of balancing. In the context of the case before it, the Court addressed the need to be "sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word." *Id.* at 407. The Court has maintained this approach since. *See Beard v. Banks*, 126 S. Ct. 2572, 2575–76 (2006) (plurality) (upholding prison policy that denied newspapers, magazines, and photographs to a group of specially dangerous and recalcitrant inmates); *Overton v. Bazzetta*, 539 U.S. 126 (2003) (upholding various prison policies restricting the number and nature of visits with inmates); *Shaw v. Murphy*, 532 U.S. 223, 230 (2001) (stating that "*Turner* provides the test for evaluating prisoners' First Amendment challenges" and upholding restriction on prison law clerks' ability to provide legal assistance to other inmates); *Lewis v. Casey*, 518 U.S. 343, 361 (1996) (holding that so long as delays in receiving legal materials or legal assistance are the product of prison regulations reasonably related to legitimate penological interests, there is no constitutional violation).

      *Shaw v. Murphy*, 532 U.S. 223 (2001), added an important point of clarification to the *Turner* analysis that is crucial in evaluating the Plaintiff's claims before this Court. In *Shaw* the Court was "asked to decide whether prisoners possess a First Amendment right to provide legal assistance that enhances the protections otherwise available under *Turner*." *Id.* at 225. A unanimous Supreme Court held that they do not. The Court explained that "in *Turner* we adopted a unitary, deferential standard for reviewing prisoners' constitutional claims." *Id.* at 230. Accordingly, "the *Turner* test, by its terms, simply does not accommodate valuations of content." *Id.* "On the contrary, the *Turner* factors concern only the relationship between the asserted

14

penological interest and the prison regulation." *Id.* On its face at least, this explanation of the standard for evaluating prisoner constitutional claims, including those asserted under the First Amendment, seems distinct from the standards for evaluating First Amendment claims asserted in the public employee context, a context which does accommodate valuations of content and affords greater protection for speech related to matters of public concern.

        (c)     *Limitations on Speech in Other Contexts*

There are of course variations of the *Pickering* and *Turner* balancing tests in other contexts. In dealing with "the complex strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied." *Speiser v. Randall*, 357 U.S. 513, 520 (1958). A context somewhat analogous to the public employment and prison contexts would be school environments. Just as "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner*, 482 U.S. at 84, the Supreme Court has made clear that "students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (internal citations and quotation marks omitted). "At the same time, . . . the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings, and . . . the rights of students must be applied in light of the special characteristics of the school environment." *Id.* (internal citations and quotation marks omitted). Similarly, the right to engage in a range of associational activities on college campuses is balanced against the colleges' interest in preventing disruption

on campus (although a college has a "heavy burden" to demonstrate the appropriateness of its action), *Healy v. James*, 408 U.S. 169, 184 (1972).

As for the public concern requirement more specifically, its application is limited, if it exists at all, in other contexts. "Nothing about the reasoning of *Connick* suggests that this public/private concern distinction has any role to play regarding speech outside the public employment setting." *Eichenlaub v. Township of Ind.*, 385 F.3d 274, 283 (3rd Cir. 2004). The Third Circuit persuasively explains the reasons for this limitation.

> The "public concern" test was formulated by the Supreme Court in addressing speech restrictions placed by governmental entities on their own public employees. Regulation of public employee speech presented two features not present in other forms of speech control. First, acting as an employer, the government has some authority to impose conditions upon those who seek jobs, including conditions that limit the exercise of otherwise available constitutional rights. Second, when someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.
>
> The Supreme Court approached public employee speech, therefore, as a balance between the rights those employees enjoy as citizens and the obligations they bear as loyal employees. In *Connick v. Myers*, 461 U.S. 138 (1983), the Court held that while government employers, like their private counterparts, have authority to manage their workers—including the authority to restrict various kinds of expression—the First Amendment imposes limits on that authority when the employees are speaking about matters of public concern. To strike the balance, the Court carved out speech on matters of public concern as a species of expression that would remain protected even for government employees. The Court reasoned that speech on public issues "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Id.* at 145.

*Id.* The logic of this limitation, highlighting the unique interests to be balanced in the public employee context, applies to the prison context as well. Prisoners do not have an obligation of loyalty to the institution incarcerating them. Rather, the balance is between the rights they enjoy as citizens and the prison's legitimate penological interests.

16

2. *Origin of the Public Concern Requirement in the Prison Context*

It is the government's interest as an employer in "promoting the efficiency of the public services it performs through its employees" that gives rise to the requirement that a public employee asserting a First Amendment retaliation claim establish that his or her speech addressed a matter of public concern. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 564, 568 (1968). If the speech is not related to a matter of public concern, then the government's interest in the efficient delivery of service trumps the employee's interest in communicating his or her thoughts. This requirement ensures the proper balance between society's interest in both robust dialogue and efficient government service. Those are not the interests to be balanced in the prison context.

In the prison environment the balance is between the prisoners' interest in communicating speech that is protected in the civilian context with the prisons' penological interests of "maintaining internal order and discipline, . . . securing their institutions against unauthorized access or escape, and . . . rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody." *Procunier v. Martinez*, 416 U.S. 396, 406 (1974), *overruled on other grounds by Thornburgh v. Abbot*, 490 U.S. 401, 413–14 (1989). It is not readily apparent how imposing the requirement that prisoner speech be related to a matter of public concern in order to state a First Amendment retaliation claim serves to strike the appropriate balance between a prisoner's speech interests and a prison's penological interests. Nonetheless, there is Seventh Circuit case law suggesting that the public concern requirement that was developed in the public employee context is applicable in the prison context as well.

17

In *McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005), a prisoner-plaintiff lost his retaliation claim because the Seventh Circuit concluded that in order to prevail his speech had to "relate to a public concern and not just a personal matter to receive First Amendment protection," and his inquiries regarding lay-in pay did not. In support of the proposition that speech must relate to a public concern in order to be constitutionally protected in the prison context, the court cited three cases.

The first case cited is *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999), with a parenthetical describing *Sasnett* as "imputing to inmate free-speech claims requirement of public-employee line of cases that protected speech must be about a 'public concern.'" *McElroy*, 403 F.3d at 858. *Sasnett* was a First Amendment case, but it dealt primarily with the free exercise clause rather than the rights to free speech or to petition the government. At issue was a Wisconsin prison regulation that prohibited prisoners from possessing crosses not attached to a rosary. *Sasnett v. Litscher*, 197 F.3d at 291, 293. In determining that the free exercise clause governed the analysis rather than the free speech clause, the Court explained:

> The plaintiffs threw in a free-speech claim on remand in an effort to get around *Smith*. That won't wash. While it is true that the wearing of a cross, like most other forms of religious observance, is public and so in a sense expressive, and while it is also true that religion has figured in some notable free-speech cases, such as *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, (1943), which invalidated a requirement that Jehovah's Witnesses salute the American flag in violation of their religious creed, to equate public religious observance to free speech would empty the free-exercise clause of a distinctive meaning. It would be, in fact, little better than a play on words. Although the plaintiffs want to wear their crosses outside their clothing, they do not want to do so in order to convert other inmates or otherwise make a public statement, and so we think their free-speech claim fails by analogy to the *Pickering* line of cases that distinguish between speech on matters of public concern and on private matters, albeit the speech itself may be public in both cases. *See, e.g.*, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571–72 (1968); *Connick v. Myers*, 461 U.S. 138, 146 (1983); *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1014 (7th Cir.1997).

18

*Id.* at 292. Although *Sasnett* arose in the prison context, there is nothing in this quoted passage that is unique to prisons. Rather, it is an explanation that decisions such as wearing a cross constitute the exercise of religion, not the communication of speech, at least for the purposes of the First Amendment. The passage seems to be distinguishing the circumstances in which the free exercise clause applies from those in which the free speech clause applies rather than imputing the public concern requirement to prison retaliation claims. To read the passage otherwise would appear to mean that the communication of religious beliefs is insufficiently important to protect from retaliation.

The second case cited is *Brookins v. Kolb*, 990 F.2d 308 (7th Cir. 1993). Brookins violated various prison regulations when he sent a letter in his official capacity as co-chairman of a prison committee, without the proper approval, requesting the use of a lie detector to help disprove allegations against another prisoner. *Id.* at 310. He was removed from the committee for these violations, and he sued for retaliation. *Id.* The court began its analysis by finding that the relevant First Amendment rights being asserted by the Plaintiff in his capacity as co-chairman of the committee were not the "right to free speech and right to petition the government for the redress of grievances," but rather "associational rights to act on behalf of the other prisoner" as a member of a prison committee. *Id.* at 312. To prevail on a retaliation claim, his burden was "to demonstrate that the prison officials—in reacting to his letter—exaggerated their response to preserving the legitimate penological objectives in the prison environment." *Id.* at 313. The district court determined that he failed to meet this burden, and the Seventh Circuit affirmed.

The court also added this analysis of Brookin's free speech rights.

We also agree with the district court that this lawsuit involves no implications

19

of free speech rights. Although Brookins argues that the prison officials retaliated
against him for exercising his right to free speech, he has not demonstrated that the
speech contained in his letter rose to the level of protected speech. Brookins did not
write the letter to inform the prison officials about a prison issue that was a matter
of public interest or concern. The letter only dealt with a matter personal to Sanders.
The letter requested the use of lie detector tests to help disprove the allegations
against Sanders. The letter did not highlight a problem with the way the prison
handled its disciplinary proceedings, or urge a change of any prison policy
precluding the use of lie detector tests in disciplinary proceedings against inmates.
Thus, we do not find the type of speech contained in the letter to be protected by the
First Amendment.

Moreover, even though Brookins contends that the letter represented an
exercise of his right to petition the government for the redress of grievances on
behalf of Sanders, the content of the letter fails to demonstrate that Brookins was
exercising such a right. He was not airing any grievances with the prison officials in
hopes of receiving satisfaction for an injury. He was merely suggesting that lie
detector tests be given to help determine whether the allegations were true before
Sanders had his disciplinary hearing, which by its own definition is a proceeding
designed to uncover the truth of the allegations presented before it.

*Id.* (internal citations omitted). This language does seem to import the requirement that speech be

related to a matter of public concern from the public employee context to the prison context.

However, the third case that the Seventh Circuit cited approvingly in *McElroy*, *Thaddeus-X v.*

*Blatter*, 175 F.3d 378, 392 (6th Cir. 1999) (en banc), explained that "[a]lthough the court

mentioned that the letter was not on a matter of public concern, *Brookins* is more appropriately

characterized as a prison employee in this situation, representing the committee in an inmate

grievance proceeding. It is a step removed from his speech as an inmate." The Sixth Circuit also

observed that "[n]o circuit has held that the *Connick* public concern limitation applies to

prisoner's speech; conversely, no circuit has held that it does not." *Id.* at 391.

It could be that the public concern requirement only applies when retaliation occurs in

response to an inmate's speech during his prison employment, although that would contradict the

*McElroy* court's reading of *Sasnett*. That approach might put prisoner employees on similar legal

20

footing to public employees. The trouble with this is that prisoner employees and public employees are not identically situated.

First, while prisons are to some extent concerned with efficiently and effectively providing services (i.e. optimal cafeteria administration), the ultimate and paramount concerns are the preservation of security and the incapacitation and rehabilitation of convicted criminals. Second, in the public employee context, retaliation takes the form of termination from employment, reduction in pay, or other work-related responses. In the prison context, retaliation can take the form of greater restrictions on liberty, such as when a prison official retaliates by preparing false conduct reports, or harsher conditions of confinement, such as transfer to a less desirable facility. It is difficult to reconcile the notion that there can be no redress for retaliation that falls short of an Eighth Amendment violation in response to speech that is related to prison employment but that does not address a matter of public concern and the notion that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner*, 482 U.S. at 84.

The Court cannot disregard the Seventh Circuit's statement that a prisoner does not state a First Amendment retaliation claim unless he demonstrates that his speech was related to a matter of public concern. *McElroy*, 403 F.3d at 858 ("questions concerning Lopac's 'personal policies' about lay-in pay must relate to a public concern and not just a personal matter to receive First Amendment protection"). But understanding the origin of this requirement, as well as recognizing the appropriate interests to be balanced in the prison context as outlined by a long line of Supreme Court cases, leads the Court to be cautious about making the public concern requirement a more onerous burden on a prisoner-plaintiff than is explicitly required by Seventh

Circuit precedent. This is particularly so in light of the Supreme Court's explanation in *Shaw v. Murphy*, 532 U.S. 223, 230 (2001) (unanimous) that "*Turner* provides the test for evaluating prisoners' First Amendment challenges," that *Turner* commands a "unitary, deferential standard for reviewing prisoner's constitutional claims," and that "the *Turner* test, by its terms, simply does not accommodate valuations of content."

3.      ***Evaluation of the Plaintiff's Speech at the February 13 Meeting***

The Defendant argues that the February 13 speech is not protected because it did not relate to a matter of public concern. In order to determine whether the Plaintiff's speech addressed a matter of public concern, the Court must evaluate the "content, form, and context of . . . [the] statement, as revealed by the whole record, " as well as the "manner, time, and place" in which the speech was conveyed. *Connick v. Myers*, 461 U.S. 138, 147, 148, 152 (1983).

Evaluating the record in a light most favorable to the Plaintiff, his comments addressed the appropriateness and constitutionality of prison library policies that applied to all inmates during a meeting that included the participation of all the relevant prison administrators and law clerks. This was not a private meeting in which the Plaintiff aired his personal grievances; it was a more public meeting with all the relevant employees discussing library policies that impacted prisoners' ability to access the courts, which is of concern to the public. The Plaintiff was not addressing his pay, his hours, his individual assignments, morale, or other such matters unique to his own condition. He did complain that the policies interfered with *his* ability to do *his* job, but that was because he believed his job was to provide services that other inmates had a constitutional right to receive. It is irrelevant whether the constitutional analysis that he

22

communicated in his speech was correct, as the First Amendment's protections do not turn on the accuracy of the speech (save for libel and slander restrictions).

The Defendant supports her argument that the Plaintiff's evidence is fatally flawed in that it does not demonstrate that his speech related to a public concern by directing the Court to a recent nonprecedential order from the Court of Appeals for the Seventh Circuit, *Whitfield v. Snyder*, No. 06-1634, 2008 WL 397457 (7th Cir. Feb. 14, 2008). In that case, "defendant Gordy Barret, a prison industries supervisor, fired Whitfield from his job in the prison following complaints Whitfield made about Barrett to defendant Dan Crum, Barrett's supervisor." *Id.* at *1. The order does not state what the prisoner's complaints to Barrett were about. The prisoner also complained to other inmates about the search of his mother's car and her subsequent arrest by prison officials when she came to visit him. The court affirmed the district court's grant of summary judgment on behalf of the defendants "because Whitfield's job-related complaints involved matters of personal, rather than public, concern and thus were not protected speech." *Id.* at *3 (citing *McElroy v. Lopac*, 403 F.3d 855, 858–59 (7th Cir. 2005)).

*Whitfield* is distinguishable because the Plaintiff here was not just complaining about the new policies as they related to him; he was complaining about how they related to other inmates as well. Also, while *Whitfield* does support the Defendant's argument that a 42 U.S.C. § 1983 prisoner-plaintiff must engage in speech relating to a public concern, the Seventh Circuit in other nonprecedential orders has recognized claims with much more tenuous links to public concerns than the Plaintiff's more narrow comments about his constitutional rights and his ability to do his

job.[1]

The Defendant notes that *Whitfield* relies on *McElroy v. Lopac*, 403 F.3d 855 (7th Cir. 2005). *McElroy* is a published opinion and therefore binding on the Court. In *McElroy* the correctional officer, Lopac, informed prisoners that the sewing shop was going to be closed down permanently and that some workers would be transferred to another job. *Id.* at 856. One prisoner, McElroy, inquired as to whether inmates who were not immediately transferred would receive "lay-in pay" while unemployed or waiting to be transferred. *Id.* at 856–67. The question upset Lopac, and not only did he decide that no lay-in pay would be provided, he allegedly created a policy that prevented McElroy from being eligible for a new job.

The Seventh Circuit affirmed the dismissal of the suit because "his 'inquiries' into lay-in pay were not protected speech as would be necessary to satisfy a retaliation claim's requirement of constitutionally protected activity." *Id.* at 858. This is because "[a]s in the public-employee context, McElroy's questions concerning Lopac's 'personal policies' about lay-in pay must relate to a public concern and not just a personal matter to receive First Amendment protection." *Id.* (citing *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999)). However, the court said it was not convinced "otherwise by McElroy's attempt on appeal to recast his 'inquiries' as preparation for grieving his complaint about pay through the prison administrative process, presumably to benefit from the constitutional protection afforded to filing grievances." *Id.* at 859 (citing *Thomson v. Washington*, 363 F.3d 969, 970–71 (7th Cir. 2004) (filing grievance is

---

[1] *Cf. Ashley v. Seamon*, 32 F. App'x 747, 748 (7th Cir. 2002) (prisoner stated a retaliation claim for the exercise of First Amendment rights under § 1983 when official prepared a disciplinary report in response to prisoner asking, "[d]id I mention that I work in the law library?"). Consistent with Federal Rule of Appellate Procedure 32.1(d), the Court will not evaluate Seventh Circuit nonprecedential orders prior to January 1, 2007, beyond mentioning that they may be in tension with the nonprecedential order cited by the Defendant.

constitutionally protected activity sufficient to support a retaliation claim)). Presumably, this means that if McElroy had been preparing to grieve his complaint, his speech would suffice to support a retaliation claim.

The Defendant equates the Plaintiff's complaints about the new library policies with the *McElroy* inquiry into lay-in pay. But *Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006), demonstrates why *McElroy* cannot be extended to embrace the Defendant's argument.

The relevant evidence in *Pearson v. Welborn* involved the following:

> At trial, Pearson testified that he and other inmates complained about aspects of the J-pod program. Pearson denounced the lack of yard time (as a named plaintiff in a previous suit over a lack of yard time, Pearson believed he was legally guaranteed at least one hour a week outdoors). He also complained about the fact that inmates were shackled to one another around a small table for group therapy.

*Pearson*, 471 F.3d at 735. The J-pod program was a unit intended to prepare prisoners for transfer to a general population prison. *Id.* at 736. The defendants retaliated against Pearson, in part, because of these complaints about the program. *Id.*

The Seventh Circuit rejected the defendants' argument that these complaints were not matters of public concern, reasoning that "Pearson's complaints related to issues affecting all J-pod prisoners and were, when viewing the evidence in the light most favorable to Pearson, designed to effect a change in prison policy." *Id.* at 741. The Court distinguished *McElroy* by observing, "[u]nlike McElroy's inquiry about whether he would get paid, Pearson's complaints related to matters of public concern, namely, how the prison operated the fledgling program designed to transition prisoners from the restrictive conditions at maximum-security Tamms to a standard general population prison." *Id.*

The Plaintiff's complaints regarding how precisely the library resources and staff would

be managed and made available to inmates are much more similar to Pearson's complaints about the J-pod program and inmates being shackled to one another during group therapy than McElroy's question about his pay. McElroy's inquiry was prompted by his individual concern for his income, whereas the Plaintiff's and Pearson's complaints were prompted by concerns that related to inmates more generally.

*Hasan v. United States Department of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005), also provides some useful guidance. There a state prisoner "filed a grievance with the prison authorities in which he accused one of the guards of having tampered with *his* typewriter." *Id.* After an investigation into the allegation, the prison officials found the accusation to be groundless and punished the plaintiff for lying about the staff. *Id.* He lost his suit, but not because his complaint did not relate to a matter of public concern. His claim failed "because the defendants presented uncontradicted evidence that they punished him not because he tried to exercise free speech but because his accusation was a lie." *Id.* The court reiterates that "[a] prisoner has less freedom of speech than a free person, but less is not zero, and if he is a victim of retaliation for the exercise of what free speech he does have, he should have the same right to a remedy as his free counterpart." *Id.* at 1006. *Turner v. Safley*, 482 U.S. 78, 84 (1987), is cited in support of this proposition.

Because the Plaintiff's comments addressed the appropriateness and constitutionality of prison library policies that applied to all inmates during a meeting that included the participation of all the relevant prison administrators and law clerks, the Court finds that his speech related to a matter of public concern and was constitutionally protected.

26

**B.       Evidence of Other Grievances**

The Defendant next argues that aside from the February 13 speech previously discussed,
the Plaintiff failed to introduce any evidence of other grievances. The Court takes this to mean
that if the Plaintiff failed to present any grievances, there could be no retaliation based on those
grievances.

The Plaintiff testified in his case-in-chief that his grievances prior to February 17, 2004,
were "verbal grievances." During his argument on the Rule 50 motion, he implied that this
testimony referred, at least in part, to complaints made during the February 13 meeting. Viewing
the evidence in a light most favorable to the Plaintiff, during that meeting the Plaintiff expressed
his view on matters of public concern and verbally grieved the application of those policies to
him personally. He also testified that around February 26, he verbally complained to the
Defendant that his books and personal materials were left unattended out in the open. It was this
complaint that he believes led to the second conduct report.

The grievances are also protected by the First Amendment, which protects the right of
free speech and provides for a right "to petition the Government for a redress of grievances."
U.S. Const. amend. I. *See also Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002). It is of
no consequence whether the grievances are submitted in writing or orally. *See Pearson v.
Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) ("We are also unconvinced that the form of
expression—i.e, written or oral—dictates whether constitutional protection attaches.").

The Plaintiff introduced evidence that he orally communicated his grievances to the
Defendant, and that communication was protected from retaliation under the First Amendment.
Grievances, by their very nature, are almost always personal and therefore do not need to relate

to matters of public concern in order to find protection in the First Amendment. *See DeWalt*, 224 F.3d 607 ("a prison official may not retaliate against a prisoner because that prisoner filed a grievance"). The Defendant's motion on this ground likewise fails.

**C.     Use of Second Conduct Report as Evidence of Retaliation**

The Plaintiff alleges that the Defendant retaliated against him for his speech by, among other things, filing two conduct reports. The first conduct report charged the Plaintiff with improperly storing personal items in the law library. He was acquitted of that charge. The second conduct report charged the Plaintiff with intimidation. He was acquitted of that charge, but found guilty of the lesser offense of disorderly conduct. Because he was found guilty of an offense on the second conduct report, the Defendant argues that *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Edwards v. Balisk*, 520 U.S. 641 (1997), preclude the Plaintiff from arguing that the second conduct report was a retaliatory act.

*Heck v. Humphrey*, 512 U.S. at 487, held that a state prisoner's complaint for damages under 42 U.S.C. § 1983 must be dismissed "if it would, necessarily imply the invalidity of his conviction or sentence," unless "the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Edward v. Balisk*, 520 U.S. at 648, applied this rule to claims for damages and declaratory relief challenging the validity of the procedure used to deprive a prisoner of good-time credits. "*Heck*'s requirement to resort to state litigation and federal habeas before § 1983 is not, however, implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence." *Muhammad v. Close*, 540 U.S. 749, 751 (2004).

28

The facts of *Muhammad* are similar to those of the instant case and demonstrate why the Defendant's argument fails. Muhammad was an inmate charged by a prison guard with violating a prison rule prohibiting "threatening behavior." *Id.* at 752. He was acquitted of the threatening behavior charge, but convicted of the lesser infraction of insolence. *Id.* As a result, he had to serve an additional seven days of detention and was deprived of privileges for thirty days. *Id.* at 752–53. Muhammad sued under § 1983 alleging that the charge was in retaliation for prior lawsuits and grievances that he had pursued against the prison guard. The Sixth Circuit held that *Heck* barred the suit. The Supreme Court reversed, explaining that *Heck* does not apply "categorically to all suits challenging prison disciplinary proceedings." *Id.* at 754. If the suit does not "raise any implication about the validity of the underlying conviction," it is not barred by *Heck*. While Muhammad was asserting that the conduct report was filed in retaliation for the exercise of his First Amendment rights, he actually conceded that the insolence determination was justified. *Id.*

Like in *Muhammad*, the Plaintiff here is not challenging the validity of his conviction on the second conduct report, nor does a verdict in his favor necessarily imply the invalidity of his conviction or sentence. To ensure that there could be no misunderstanding, the jury was instructed:

> You have heard evidence pertaining to conduct reports filed against the Plaintiff on February 17, 2004, and February 26, 2004. The Plaintiff contends that those reports were filed in retaliation for the exercise of his First Amendment rights. You may only consider those reports as they relate to the Plaintiff's claim of retaliation. You may not question the validity of the administrative proceedings that subsequently addressed those reports, nor may you question the outcome of those proceedings.

(Jury Instruction 21, DE 134.)

Because the Plaintiff's claims do not necessarily imply the invalidity of his conviction or

sentence, they are not barred by *Heck v. Humphrey* and its progeny.

## CONCLUSION AND ORDER

The jury found that the Plaintiff verbally complained about conditions at the Miami Correctional Facility and that the Defendant retaliated against him as a result of those complaints. The Court finds that those complaints were related to matters of public concern and constitutionally protected. The Defendant also orally grieved the handling of his personal property and the application of library policies to him. That speech was likewise protected. The Court further finds that the Plaintiff's proffer of the second conduct report as a retaliatory act does not necessarily imply the invalidity of his conviction or sentence, and as such is not barred by *Heck v. Humphrey*. The Defendant's renewed motion for judgment as a matter of law is accordingly DENIED.

Judgment is ENTERED for the Plaintiff and against the Defendant in the amount of $1,150.

SO ORDERED on June 6, 2008.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION